I do want to thank the Court for allowing me to experience Halloween in New Orleans, which is really something different. It's good that you survived, at least unscarred to where we can't see the scars. Right. Coastal Conservation represents about 120,000 recreational fishermen around the country, including many thousands in the five Gulf states who fish for red snapper, which is the subject of this case. The National Marine Fisheries Service, which I'll refer to as NMFS, adopted Amendment 40, which for the first time sets a red snapper fishing quota for federally licensed charter boats, which is separate from the fishing quota for all other forms of recreational fishing. Amendment 40 allocates 42% of the former recreational quota, about 2 million pounds of red snapper, for the exclusive use of the federally licensed charter boats. Section 16 U.S.C. 1883d, which is part of the Magnuson-Stevens Act, applies only to Gulf of Mexico red snapper and requires NMFS to establish a single commercial quota for red snapper and a single recreational fishing quota, which, quote, shall include charter fishing. There's no mystery why charter fishing was included as part of recreational fishing, although there's obviously a commercial element to it. The people who fish from charter boats are the same recreational fishermen who are just like everyone else who fishes from their own boat or a friend's boat. In fact, sometimes you can be on your own boat one day and on a charter the next. This case appears on the surface to be a dispute between two fishing interests, but it's actually more than that. The case also involves an ongoing dispute between the five Gulf states and the federal government over the proper way to regulate red snapper. Each of the five Gulf states regulates the red snapper season in their own state waters, which in the Gulf of Mexico extends nine miles out from the shore of each state. Currently about half of the entire red snapper fishery in the Gulf of Mexico is in state waters and the other half is in federal waters. States and the feds are in conflict over red snapper management. As NMFS has reduced the recreational red snapper fishing in federal water over the past two decades from 365 days a year to nine days a year at this time, the states have all responded by increasing their red snapper fishing seasons. NMFS has no legal authority to control state fishing seasons, so the federal fishery management program has to accept the regulatory decisions of the five Gulf states. But as you might guess, the federal fish managers do not like having to do that. And even within the federal side of fishery management, there is conflict between the states and the feds. Each of the Gulf states has a voting member on the Gulf of Mexico Fishery Management Council, which along with NMFS regulates the federal fisheries. NMFS has a member on the council as well. Amendment 40 followed a very unusual path. Initially both of the federal red snapper advisory groups voted against or recommended against adopting Amendment 40. The Gulf Council went ahead anyway. The initial vote on Amendment 40 without NMFS participating was an 8-8 deadlock with all five of the state representatives voting against Amendment 40. The NMFS representative at that time announced that he was going to vote in favor of Amendment 40. At that point, the Alabama representative said that he would change his vote if they limited Amendment 40 to a three-year trial period from 2015 to 2017, and that was accepted. So in this instance, NMFS was actually the decision maker on the Gulf Council. After the vote, the four dissenting state members wrote a document they called a minority report, which appears at tab 7 in our record excerpts, and we would urge the Court to read that letter very carefully. It lays out all of the objections that the states had to both the procedure and the content of Amendment 40 and touches on all the issues we have raised in this case. In the district court, the State of Louisiana, which was one of the signatories of that, was an amicus on our side of the case. We think this state-federal conflict is really the key to the case because if you read the decision on Amendment 40 as well as the briefs in this case, you can see that NMFS is essentially blaming the states for their need to adopt Amendment 40 and saying if the states had just followed the federal regulations, then they wouldn't have had to do that. The conflict also explains the configuration of interests in this case. There are two national environmental groups on this side of the government. So with that backdrop, you're otherwise going to run out of time. Okay, I won't. You have an old background. You're generally familiar with what's there. So NMFS committed three legal errors in approving Amendment 40. First, NMFS violated Section 1883, which requires red snapper charter fishing to be regulated as part of a single recreational fishing quota. The statute has a plain meaning. The recreational red snapper quota quote shall include charter fishing, and all recreational fishing must end when that single quota is reached. Within that single quota, there's no special treatment for federally licensed charter boats versus recreational fishing from a private boat or a state-licensed charter boat. There are about 6,000 state-licensed charter boats, about 1,300 federally licensed charter boats. All forms of recreational fishing compete equally under this single quota. No part of the quota is reserved for charter fishing. Amendment 40 does not follow the statute. Federally licensed charter fishing has its own separate quota, and the quota for recreational red fishing does not include charter fishing, contrary to the words of the statute. The result is that the federally licensed charter boats now have their own quota, giving them about 2 million pounds of red snapper for their exclusive use during the year and a fishing season which is five times longer than the fishing season available to the private recreational fishers. There's nothing in the statute, though, is there, that forbids subdividing recreational fishing between charter and private? The statute does not on its face address that, other than the requirement that the recreational fishing quota shall include charter fishing, which excludes, therefore, the ability of the agency to establish a third quota for charter fishing that does not include a charter fishing quota that is not part of the recreational quota, which is what they did. Now, NMFS has three answers to why they are allowed to do that. The first is that they are not creating a new sector for charter fishing, but they are only creating two components within the recreational sector. And so they say using the word component rather than the word sector is what allows them to get around Section 1883D. The problem with that argument is that the statute doesn't refer to the recreational fishing sector, doesn't use the word sector. It says recreational fishing shall have a quota, and that quota shall include charter fishing. So using component rather than sector is simply irrelevant to the words of the statute. Secondly, they say, and this is contradictory to their first argument, they say the component quotas actually don't matter because NMFS also adopted a total recreational quota, which is the sum of the two components, the charter component and the private recreational component. So here's how I answer the NMFS argument. This is as if a mother says to her son, you can have two cookies. And then she says to her daughter, who's older, you can have four cookies. So those are the rules. If the mother says, and between the two of you, you can only have six cookies, the mother has not said anything. It's not changed the rules because the boy has to stop at two and the girl has to stop at four, so they have to stop at six regardless of whether there's also a separate rule that says the combined total is six. The combined recreational total is really window dressing, which is evidently intended only to attempt to satisfy Section 1883D, but it has no regulatory effect because, like the two kids, the charter fishermen have to stop at roughly 2 million pounds of red snapper and the recreational fishing quota has to end when 4 million pounds are caught. So they have to stop at the 6 million, which is roughly the combined total, regardless of whether there is a combined total or not. So the combined total, which they seek refuge from the statute, has no regulatory effect or meaning. And they make the point, in fact, what they're doing is they say, we're doing the same thing we could do if that parenthetical shall include charter fishing was not in the statute, which means the parenthetical really has no meaning, but a statute has to have some meaning. So the NMFS meaning cannot be right. The third NMFS argument is that we did not provide evidence of that Congress intended the plain meaning of the statute. And it's certainly true that the congressional reports did not say anything about this issue one way or the other. But that's not the point. The point is that when a statute has a plain meaning, you don't have to have proof from congressional reports that Congress intended the plain meaning. The plain meaning is the meaning unless the result is absurd and no one has suggested the result here would be absurd. Our second claim is that NMFS violated a different section of the Magnuson-Stevens Act that requires the agency to assess, specify, and analyze the economic and social impacts of their decisions. The key word I would suggest is specify, and the next key word is analyze. Now in 2008, NMFS and the Gulf Council knew that they had no data on the economic and social impacts of creating a separate sector, which they then called sector separation, even though they later changed the terminology to component. However, you can tell just by looking at the agency's websites, NMFS in Florida has a whole economics branch of people who do economic studies, and the Gulf Council has two economists, an anthropologist, and a statistician. So they had the capability to produce the data, at least to estimate or produce a range of what the impacts might have been. But instead, for a period of seven years, they did absolutely nothing to try to assess or specify or analyze the economic impacts, and when it came time to make the decision, they said, well, we can't do it because we don't have any data. Well, it's kind of like the famous story of the child who murders his parents and then throws himself on the mercy of the court as an orphan. It's a self-inflicted wound. They chose not to have the data, and they shouldn't be able to say, since we don't have the data, we don't have to do the analysis. Their analysis literally was more fish is better than less fish, which could not, by any stretch of the imagination, be considered specifying impacts or analyzing impacts. It's an obvious statement that they knew from the very beginning. It doesn't tell you anything. Our third claim is that the decision to allocate the charter fishermen two and a half times what they are currently catching was based on an explanation that literally makes no sense. The explanation was they chose to use 30-year-old data of what the different groups were catching 30 years ago, and 30 years ago the charter fishermen were catching a much higher percentage than they are today. It's changed dramatically over 30 years. All right. Mr. Utzig, you've exhausted your initial time. Yes. Thank you. I will stop. Thank you. You have reserved your rebuttal time. All right. Thank you. Mr. Shilton. May it please the court, I am David Shilton, representing the Department of Commerce and its sub-agency, National Marine Fisheries Service. With me at the council table is Mara Levy, who is from the NOAA General Counsel's Office, and I will be sharing five minutes of my time with Michelle Felterman, who is a student at Tulane Law School, represents interveners, the charter fishermen, and she is here with Professor Adam Babich. I want to first talk about the statutory interpretation issue. The language of Section 16 U.S.C. 1883d, which is reprinted at pages 7 to 8 of our brief, I think is very straightforward. It says that the plans for the Red Snapper fishery after 1996 must establish separate quotas for recreational fishing and commercial fishing. It doesn't say single quotas, as has been paraphrased here. It says separate quotas. And then it has a parenthetical following the term recreational fishing, and that parenthetical clarifies that recreational fishing, quote, for the purposes of this subsection, shall include charter fishing, end quote. And then finally, the separate quotas, when they're reached, have to result in a prohibition on the retention of fish for the remainder of the fishing year. So the appellants here are focusing on the parenthetical that recreational fishing shall include charter fishing. But as this Court has held in cases like Peters v. Ashcroft, parentheticals in legislation are properly read as simply explanatory, not substantive directives. And that's exactly what this one does here. It's not self-evident what category charter boats fit in. After all, charter boats are a commercial enterprise, but they serve recreational fishers. And so this parenthetical just clarifies that charter boats must be included within the recreational category. It doesn't do any work beyond that. Now, Amendment 40, which is what's being challenged here, does nothing that Congress dealt with in Section 1883d. It doesn't alter the separate quotas for the recreational fishing and the commercial fishing that Congress required. Those quotas still exist, and they still have meaning. If the recreational fishing reaches the recreational quota, then retention of fish has to stop. Even if one of the subcomponents still has its subquota and could fish more, it has to stop anyway. So it's not an illusion, this overall recreational quota. And our argument is not based on the use of the language  We simply use that language to clarify that the overall recreational quota applies to the recreational sector, and then the agency, in order to implement that and make sure it's not being exceeded, has established these subquotas, which is something that commonly does in fisheries. And the agency has broad authority, under the Magnuson Act, under 16 U.S.C. 1853c, to implement measures to preserve and protect the fishery. And that's the authority that it's used here to administer the recreational quota by separating these two sectors. It addresses a problem that Congress never addressed in 1996. Congress simply said you've got to have a separate quota for the overall recreational fishing vis-a-vis the commercial fishing. They had had a quota for commercial fishing before, but not one for recreational. Congress wanted one for recreational as well, but it just didn't go beyond that. But a problem arose that Amendment 40 dealt with, which is that, as Mr. Utzik has pointed out, private vessels can fish in state waters even after the federal season closes, and there's nothing NIFS can really do about that. So what was happening is that the charter component, which, once the federal season closes, has to stop retaining red snapper. They were subject to this very short season, which got shorter each year because the private vessels were able to fish in state waters, and many of the states were extending their seasons, some all year long. And also the private vessel component is an open-access fishery. Anyone can go out and fish for red snapper, while the charter component, there's a moratorium on new permits. So because they're so different, Amendment 40 decides that you should separate them, regulate them separately, and have a separate quota for each, and that has a number of advantages. It has conservation advantages because the studies show that there is a lower rate of discards for the charter component than the private vessel component. And it has fairness components because what had been happening is the charter component had been getting a smaller and smaller share. You know, starting back in the late 80s, it harvested about two-thirds of the red snapper overall catch, and by 2013, it was down to around 16%. So this was a way to reestablish some fairness and to promote conservation goals. And this is just not something that Congress dealt with in Section 1883D. So the NMSA's point is simply that it has this broad authority under Section 1853 to do this sort of implementation. Now, with regard to the economic effects, as I understand it, it would have been acceptable under the statute not to have done that. Either way is within the ambit of the decision-making authority. Is that right? That's correct, yes. This is just a problem that Congress didn't speak to in 1883. So it's really covered by 1853, which is the general grant of authority to the Gulf Council and to NMSA to adopt measures to protect the fishery and carry out the purposes of the Act. So with regard to the economic and social impacts, there is a great deal of data in the Fisheries Impact Statement about economic and social impacts. As the district court said, there's substantial data there. And the district court goes through that at pages 15 and 16 of its decision. And what the controversy was about here was that some of the fishermen said, well, you haven't quantified the economic effect on these two components. And NMSA said, that's correct. We've done a qualitative analysis. We believe that there will be certain economic effects. It's likely that the charter component will receive some economic benefit compared to the recent years where fishing has been so constrained. It's basically returned to the situation of a few years back, which is fair. And conversely, there will be some economic impact on private vessels because there will be less fish available for them in the federal areas, but they will be able to continue to fish in state areas, and plus they can fish for other species. And because there are so many unknowns about how private vessels will react to this and how states will react, to try and quantify an economic impact would really be meaningless. There's just too many unknowns, too much unpredictability. And the statute does not require a quantified economic analysis. It simply says that the agency has to assess the social and economic effects, and the agency certainly did that here, and doing so was reasonable. As to the data that the agency used to set the quotas, the opposing counsel has said, well, they used 30-year-old data. Well, what they did was they took two data sets. One was the recent data from 2006 to 2013, and another set was data from 1986 to 2013. So the recent data, which the private vessel owners would like to focus on, was actually double-counted because it's in both groups. NIMS averaged those two. Because, NIMS said, to base the quotas just on the recent years is really unfair because those years reflect some regulatory changes that have been quite unfair to the charter sector. Those changes are the longer state seasons and the fact that there's a moratorium on charter boat permits and charter boats have been forbidden from fishing in state waters after the federal season is closed. And so because of those changes, it's only fair to at least use some data from the older years before those changes took place. So it explained its rationale, and the statute doesn't require anything more than that. For better or for worse, it sounds a lot like these rolling political polls that we hear where they drop off the old days and add some new ones so that it's a mixture of the old and the new. It is, and there's a lot of discretion in making that sort of judgment. But, you know, as I say, the more recent years were given more weight. And there's a long discussion of this in the Fisheries Impact Statement, which is in the record, and the agency looked at seven different alternatives for use of data and made a considered decision which I don't think is arbitrary and capricious. I don't want to take any time from there, unless there are other questions. Thank you very much. All right. Thank you, sir. Ms. Feldman, welcome to the court. Thank you. May it please the Court, Michelle Feldman, representing the Charter Fishermen's Association. Your Honors, I'm going to focus on the allocation of the recreational quota between the private anglers and the charter fishing components. The appellant, the Coastal Conservation Association, is arguing that there was no rational basis to consider historic data in addition to the recent data when determining the allocation. But, Your Honors, one purpose of this amendment is to save the small businesses that make up the federally permitted charter fleet. The counsel and the secretary explained in the Fishing Impact Statement on page 16292 of the record that a reason for Amendment 40 is to discontinue the decreasing proportion of landings from federally permitted for hire vessels and an associated likely decline in social benefits. Your Honors, these small businesses are at risk due to the challenges that they face because of pre-Amendment 40 regulations. As is stated in the record on page 16322, over half of the recreational quota was projected to be caught outside of the federal season in 2014. The federally licensed charter fishermen are mandated that they cannot fish when the federal season is closed, which means that when half of the quota was projected to be caught during state seasons, the charter fishermen and the people who rely on them to access the federal waters to fish can't go fishing. Captain Bill Staff testified that my user group, the federally permitted vessel, is the only user group that can't go catch red snapper today. I can't take my boat out. Anybody else can go to Florida, Texas, Louisiana, some other noncompliant state and fish. And in addition to that, there's been a moratorium on the number of federally permitted charter fishermen, which limits the number of those fishermen. There's no such limit on the private anglers. So in light of these restrictions, which only impact the federal charter fleet, the question becomes, why does it matter? Why do we need to save these small businesses? And the answer to that, Your Honors, is simple. The federally permitted charter fishermen are the only way for the everyday, normal person who doesn't own their own boat to access federal waters and go fishing. What is our standard of review at the appellate level in reviewing what was done here? It needs to be reasonable. It can't be arbitrary and capricious. Arbitrary and capricious, all right. Yes, Your Honor. In order to get to federal waters, you have to go a minimum of 3 miles, and in Texas and Florida, you have to go 9. In order to get that far out, you have to own a boat capable of safely traveling that far out in the ocean. And it's simply not the case that everyone can afford such a boat. Captain Bill Staff testified on page 9281 that last year he took about 1,200 people fishing. Most of them cannot afford their own boat. Another commenter on page 16540 stated that every American citizen deserves access, as they do not all own a boat to access this fish. They depend on the for hire vessel. And on top of all that, there's a lot of people that come from inland parts of the country that want to fish in the federal waters of the Gulf of Mexico. They're not coming down here with their own offshore boat. They depend on the charter vessels to be able to take them to access this fish. There would also be a safety component, wouldn't there, that charters would have a lot of safety protections that possibly private non-charter vessels wouldn't have? Yes, sir. You're going out with professional captains and crew. The mayor of Orange Beach, Alabama, stated that after about two days on the beach, tourists are looking for something new to do, and the charter industry is a big, big part of that. Another captain, Captain Mike Rowell, testified on page 9295, I have a group of amputees in wheelchairs. I take them fishing during the federal snapper season, but this year the trip fell out of the snapper season, and they canceled because they couldn't catch anything. And, Your Honors, in addition to providing access to the public to this fishery, the charter industry also helps improve the conservation of the fishery. From 1997 to 2013, the recreational landings exceeded its quota by 88% of the time, 15 of the 17 years. But the charter industry results in less waste. It's uncontested in the record that the relative number of dead discards is lower for the charter industry than it is for the private anglers. Thus, by preserving the charter industry, you improve the conservation of the fishery by reducing bycatch and also discard mortality. The bottom line is that the secretary and the council had good reason to consider historical data in addition to the recent data, because that historical data represents a time before the regulatory system put the charter fishermen at such a disadvantage. This industry deserves to survive because it's the only way for the public to access the federal waters and go fishing, and it also helps to improve the conservation of the fish. The resulting allocation is well supported in the record and therefore should be upheld. Thank you. All right. Thank you. Mr. Retsig or Bowen, if you are inclined. So the question that is left from the comments of the opposing attorneys is what does Section 1883D, in particular the parenthetical, shall include charter fishing? What does it mean? It has to mean something, and something it has to mean is that the recreational fishing quota has to include charter fishing. So if NIPS had simply adopted the two quotas, one for private recreational and one for charter fishing, and hadn't gone through the combined quota ruse, which I'll impolitely call it, then you'd have to say Section 1883 was not followed. It has to mean something. The something is the charter fishing quota has to be part of a combined recreational quota. The reality is it's not. The reality is it is treated separately. It has its own cap. There is no connection between the charter cap and the private recreational cap. It's not what the statute requires. If your reading is plausible, but the other reading and implementation is equally plausible, the standard is arbitrary and capriciousness. So, you know, how do you demonstrate to us that there's reversible error, though you differ with the interpretation, the implementation, etc., but under the standard, why does your perspective on what the statutory language ought to mean give you an upper hand on prevailing? The answer is that, first of all, under the Chevron context, we're focusing on step one. Is there a plain meaning? Our answer is there is a plain meaning, and the plain meaning starts with the fact that the statute has to mean something, and if NMFS has its way, it doesn't mean anything. The parenthetical shall include charter fishing. It has no meaning. Well, what do you say to counsel Opps' argument? You're focusing on a parenthetical, yet there are lots of cases in which you've spoken to the limited vitality of a parenthetical. So what do you do with that argument? What cases actually say, and there's one in particular that they quote, is that a parenthetical cannot overcome the other text of the statute. Let's give them that. Fine. That's not this case. The parenthetical doesn't reverse anything else. It adds a cause, and there is no law, no rule, that says a parenthetical in a statute can be given no meaning. The rule is that every word and cause in a statute has to mean something, and I defy you to tell me what that parenthetical means if you can have a separate quota for charter fishing that is apart from the quota for recreational fishing. And one of our arguments is the canon of statutory interpretation, inclusio unius, exclusio alterius. So that means in this context, where Congress says you have to have two, by implication, Congress means you can't have three or five or eight or ten. You have to have two. Well, the reality is, when you look at this, we have three, not two. So what does that statute mean if this is permissible? Thank you. All right. Thank you, sir. Thank you to all counsel who presented the case. Ms. Feldman, thank you for your presence. You've equated yourself quite well, as has been the past situation with others who've come. So we look forward to seeing you another day in a different capacity to argue before the Fifth Circuit. Thank you.